**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| ELEVANCE HEALTH, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO.   1:26-cv-1200 |
| | ) |
| SHANE HOCHRADEL, | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT**

Plaintiff Elevance Health, Inc. ("**Elevance Health**"), for its Complaint against Defendant Shane Hochradel ("**Hochradel**"), alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Elevance Health is an Indiana corporation with its principal place of business at 220 Virginia Avenue, Indianapolis, Indiana, 46204, and is a citizen of the State of Indiana.

2. Defendant Hochradel was formerly employed by Elevance Health, most recently as its Chief Execution Officer. Hochradel is a citizen of the State of Minnesota.

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

4. Personal jurisdiction and venue are proper in this District and Division because Hochradel agreed and consented, through a valid and enforceable forum-selection clause, to submit to venue in the state and federal courts located in Indiana for the resolution of any disputes arising out of or relating to the Agreements. Additionally, Elevance Health is headquartered in

Indianapolis. As an employee of Elevance Health, Hochradel reported to executives based in Indianapolis, communicated regularly with Indiana-based employees, and traveled to Indiana for meetings.

## FACTUAL BACKGROUND

5.      Elevance Health is one of the nation's leading healthcare benefit companies with more than 40 million members enrolled in its affiliated health plans. Elevance Health serves its members nationwide.

6.      Elevance Health's medical membership includes seven different customer types: Local Group, Individual, National Accounts, BlueCard, Medicare, Medicaid, and the Federal Employment Program (or FEP). Elevance Health operates Medicare Advantage health plans in more than 20 states, including Arizona, California, Nevada, and Texas.

7.      Elevance Health operates in a highly competitive industry where marketplace goodwill, national business strategies, technological innovations, transformation initiatives and confidential pricing and discount information are critical to its success.  As such, Elevance Health has expended substantial time, labor, and money to create, develop, and keep secret among other things:  (i) customer and supplier lists, business prospects and leads; (ii) confidential profit margin, pricing and discount information; (iii) business and marketing plans, ideas, and strategies; (iv) financial and market analysis material; (v) strategic and growth plans; and (vi) other confidential concepts, practices, and ideas related to Elevance Health's business.

8.      Elevance Health has also dedicated significant resources to developing its transformation team, which is responsible for, among other things, technological transformation and automation to modernize its operating processes, increase enterprise value, and streamline development processes.

9.      To protect its confidential, trade secret, and proprietary information, Elevance Health has adopted company-wide written policies restricting the disclosure and/or use of this information other than for official company purposes.  Executives at Elevance Health also execute employment agreements containing strict confidentiality provisions.

10.      On January 27, 2021, in consideration of his employment at Elevance Health, Hochradel voluntarily entered into an Employment Agreement with Elevance Health, a true and correct copy of which is attached hereto as Exhibit A.

11.      Hochradel also entered into an amended Executive Agreement, restated effective March 1, 2024, a true and correct copy of which is attached hereto as Exhibit B.

12.      Over the course of his employment with Elevance Health, Hochradel received equity awards.

13.      On March 2, 2026, in exchange for valuable equity in Elevance Health, Hochradel voluntarily entered into a Performance Stock Unit Award Agreement, a true and correct copy of which is attached hereto as Exhibit C.

14.      On March 2, 2026, in exchange for valuable equity in Elevance Health, Hochradel voluntarily entered into a Restricted Stock Unit Award Agreement, a true and correct copy of which is attached hereto as Exhibit D.

15.      On March 2, 2026, in exchange for valuable equity in Elevance Health, Hochradel voluntarily entered into a Nonqualified Stock Option Award Agreement, a true and correct copy of which is attached hereto as Exhibit E.

16.      The Performance Stock Unit Award Agreement, Restricted Stock Unit Award Agreement, and Nonqualified Stock Option Award Agreement are referred to herein together as the "**Stock Agreements**."

3

17.     The Employment Agreement, Executive Agreement, and the Stock Agreements are referred to herein collectively as the "**Agreements**."

18.     Under the Agreements, Hochradel acknowledged that, based on his employment with Elevance Health, he would have access to and use certain Confidential Information that constitutes the trade secrets and confidential and proprietary business information of Elevance Health.

19.     Elevance Health's "Confidential Information" is defined as:

> information created and used in its business which is not generally known by the public, including, but not limited to, plans, designs, concepts, computer programs, formulae, and equations; product fulfillment and supplier information; customer and supplier lists, and confidential business practices of the Company, Affiliates, and any of its customers, vendors, business partners or suppliers; profit margins and the prices and discounts the Company obtains  or has obtained or at which it sells or has sold or plans to sell its products or services (except for public pricing lists); manufacturing, assembling, labor and sales plans and costs; business and marketing plans, ideas, or strategies; confidential financial performance and projections; employee compensation; employee staffing and recruiting plans and employee personal information; and other confidential concepts and ideas related to the Company's business…For purposes of this Agreement, Confidential Information includes, but is not limited to, information that constitutes a trade secret under applicable state or federal law.

(*See* Ex. C § 7(a)(i); Ex. D § 7(a)(i); Ex. E § 7(a)(i).)

20.     Pursuant to the Agreements, Hochradel agreed to the following restrictions on the use or disclosure of Elevance Health's Confidential Information:

> [The Participant] agrees that [the Participant] will not for himself or herself or for any other person or entity, directly or indirectly, without the prior written consent of the Company, while employed by the Company and thereafter:  (A) use Confidential Information for the benefit of any person or entity other than the Company or its affiliates; (B) remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Information, except as required to perform Participant's duties for the Company or its affiliates; or (C) while employed and thereafter, publish, release, disclose or deliver or otherwise make available to any third party any Confidential Information by any communication, including oral, documentary, electronic  or  magnetic information  transmittal  device  or  media. Upon Termination, Participant shall

4

return all Confidential Information and all other property of the Company. This obligation of non-disclosure and non-use of information shall continue to exist for so long as such information remains Confidential Information.

(*See* Ex. A § 9(a)(ii); Ex. B § 3.6(a)(ii); Ex. C § 7(a)(ii); Ex. D § 7(a)(ii); Ex. E § 7(a)(ii).)

21.    Because he would have access to Elevance Health's confidential and trade secret information, Hochradel further agreed that he would not, without prior written consent of Elevance Health, for a period of twelve months following the end of his employment with Elevance Health, "directly or indirectly, in the Restricted Territory,… obtain a Competitive Position or perform a Restricted Activity for or on behalf of a Competitor." (*See* Ex. A § 9(c); Ex. B § 3.6(c); Ex. C § 7(b); Ex. D § 7(b); Ex. E § 7(b); *see also* Ex. A sched. A.)

22.    Under the Agreements,

a.  "Competitive Position" means:

any employment with or performance of services for or on behalf of a Competitor, if (A) the services to be performed by Participant are the same as or similar to the services that Participant performed for the Company in the last twenty-four (24) months of Participant's employment with Company (the "Look Back Period"), or (B) in the performance of such services, Participant will likely use any Confidential Information of the Company.

b.  "Restricted Territory" means:

any geographic area in which the Company does business and which Participant provided services in, had responsibility for, had a material presence or influence in, or had access to or knowledge of Confidential Information about, such business, within the Look Back Period.

c.  "Restricted Activity" means:

any activity for which Participant had responsibility for the Company or about which Participant had access to Confidential Information within the Look Back period.

d. "Competitor" means:

any entity or individual (other than the Company) engaged in any one or more of the following: management of network-based managed care plans and programs; administration of managed care services; provision of health insurance, long-term care insurance, level-funded insurance, dental, life, or disability insurance; administration of flexible spending accounts, COBRA continuation coverage, coordination of benefits, or subrogation services; or the provision, delivery, or administration of health benefit plans or health care services such as pharmacy benefits management (including Specialty pharmacy), value-based care delivery, behavioral health, palliative care, care for chronic and complex conditions, digital healthcare platforms, medical benefits management solutions, or health care research (including health economics and outcomes); or any other aspects of the business or products or services offered by the Company, as to which Participant had responsibilities or received Confidential Information about, during the Look Back Period.

(*See* Ex. C § 7(b)(iv); Ex. D § 7(b)(iv); Ex. E § 7(b)(iv).)

23.    Pursuant to the Agreements, Hochradel also agreed not to solicit for a Competitor, either individually or in any other capacity, any customer or employee of Elevance Health. (*See* Ex. A § 9(d)-(e); Ex. B § 3.6(d)-(e); Ex. C § 7(c)-(d); Ex. D § 7(c); Ex. E § 7(c).)

24.    By entering into the Stock Agreements, Hochradel also agreed to notify the Chief Human Resources Officer within five business days of receiving an offer of a Competitive Position with a Competitor, and to provide a detailed description of the job responsibilities and the identity of the Competitor to enable Elevance Health to determine whether his new opportunity constitutes a violation of the Stock Agreements. (*See* Ex. C § 7(b)(vi); Ex. D § 7(b)(vi); Ex. E § 7(b)(vi).) Specifically, the Stock Agreements provide:

If Participant receives an offer of a Competitive Position with a Competitor, as those terms are defined above, Participant shall notify the Company's Chief Human Resources Officer, via the contact information provided in the Summary, within five business days of receiving the offer and such notification shall include a detailed description of the job responsibilities and the identity of the Competitor. The description must be specific enough

6

for the Company to determine whether Participant's new opportunity constitutes a violation of this provision.

(*Id.*)

25.    Moreover, by entering into the Agreements, Hochradel agreed that the non-competition provisions contained in the Agreements (the "**Non-Competition Provisions**") are "reasonable and necessary to preserve the legitimate business interests of the Company, its present and potential business activities and the economic benefits derived therefrom." (*See* Ex. A § 9(h)(i); Ex. B § 3.8(a); Ex. C § 9(a); Ex. D § 9(a); Ex. E § 9(a).) He also agreed that these provisions would "not prevent him [] from earning a livelihood in [his] chosen business and are not an undue restraint on the trade of [the Participant,] or any of the public interests which may be involved." (*Id.*)

26.    Hochradel further agreed to an Indiana forum selection clause wherein he agreed and consented to submit to venue in the state and federal courts located in Indiana for the resolution of any disputes arising out of or relating to the Agreements. (*See* Ex. A § 17(f); Ex. B § 5.4(f), Ex. C § 21; Ex. D § 21; Ex. E § 21.)

27.    Additionally, Hochradel agreed that if he at any time breached the Non-Competition Provisions, he must forfeit all unexercised Elevance Health stock options and any outstanding restricted stock (the "**Equity**"), and return to Elevance Health the excess of the fair market value over the exercise price for all stock acquired on exercise of an option within the last twenty-four (24) months, and the fair market value of any common stock that became vested within the last twenty-four (24) months (the "**Stock Excess Value**"). Specifically, the Agreements provide:

> (iii) [the Participant] shall pay to the Company (A) for each share of common stock of the Company ("Common Share") acquired on exercise of an option under a Designated Plan within the 24 months prior to such

7

breach, the excess of the fair market value of a Common Share on the date of exercise over the exercise price, and (B) for each share of restricted stock and/or performance stock that became vested under any Designated Plan within the 24 months prior to such breach, the fair market value (on the date of vesting) of a Common Share.

(*See* Ex. A § 9(g); Ex. B § 3.7(a); Ex. C § 8(a); Ex. D § 8(a); Ex. E § 8(a).)

28.     Hochradel agreed that these amounts would not reduce any money damages caused by a breach. (*Id.*)

29.     Hochradel notified Elevance Health of his resignation on May 8, 2026; his last day of work at Elevance Health was on May 13, 2026; and he was paid by Elevance Health through May 29, 2026.

30.     Hochradel accepted a position with Alignment Healthcare, Inc. ("**Alignment**") as the Chief Operations Officer before he resigned from Elevance Health.

31.     On May 11, 2026, Elevance Health, upon learning of Hochradel's decision to accept a position with Alignment, reminded Hochradel of his contractual obligations owed to Elevance Health.

32.     On May 12, 2026, Elevance Health also informed Alignment that Hochradel owed contractual obligations to Elevance Health.

33.     Hochradel began his employment as Alignment's Chief Operations Officer on June 1, 2026.

34.     Alignment is a "Competitor" of Elevance Health as defined in the Agreements because it is "engaged in . . . management of network-based managed care plans and programs; administration of managed care services; provision of health insurance…[and] other aspects of the business or products or services offered by" Elevance Health. (*See* Ex. A § 9(c)(iv); Ex. B § 3.6(c)(iv); Ex. C § 7(b)(iv); Ex. D § 7(b)(iv); Ex. E § 7(b)(iv).) Specifically, Alignment is a national

8

managed care organization that directly competes with Elevance Health in the Medicare Advantage line of business. Alignment operates health plans in several states, including Arizona, California, Nevada, and Texas, which are critical markets for Elevance Health business.

35. The role of Chief Operations Officer at Alignment is a "Competitive Position" as defined in the Agreements because: (A) Hochradel will have to perform "the same or similar" services at Alignment as he performed at Elevance Health during his last twenty-four (24) months of employment with Elevance Health; and (B) Hochradel inevitably will use Elevance Health's Confidential Information in his executive-level position at Alignment. (*See* Ex. A § 9(c)(i); Ex. B § 3.6(c)(i); Ex. C § 7(b)(i); Ex. D § 7(b)(i); Ex. E § 7(b)(i).)

36. Indeed, in his role at Alignment, Hochradel will be responsible for, among other things, overseeing critical operational functions, coordinating provider operations, and driving transformation initiatives—the very responsibilities he had during the final two years of his employment at Elevance Health.

37. During his final two years of employment, Hochradel worked for Elevance Health as its Chief Operations Officer for Health Solutions and, beginning in January 2026, as its Chief Execution Officer.

### Chief Operations Officer for Health Solutions

38. In his role as Chief Operations Officer for Health Solutions, Hochradel developed extensive knowledge of various aspects of Elevance Health's relationships with hospitals, physicians, and other health care providers. These relationships, and the pricing models, reimbursement arrangements, and contracting strategies underlying them are critical in facilitating Elevance Health's provision of healthcare services to its members.

39.    Hochradel had access to confidential Elevance Health information regarding Elevance Health's optimization of artificial intelligence to ensure network adequacy and accurately identify and categorize providers.

40.    He also knew specific Elevance Health financial goals related to efficiency measures to be achieved through the use of artificial intelligence, among other transformation levers.

41.    Hochradel had access to specific data about providers with whom Elevance Health contracted, particularly in California, where Alignment is headquartered.

42.    The information Hochradel obtained in his role as Chief Operations Officer for Health Solutions is Elevance Health Confidential Information.

43.    Hochradel will have an executive role at Alignment as Chief Operations Officer. In this role, Hochradel will oversee enterprise operations and lead the company's technological trajectory.

44.    Because his new role at Alignment will involve overseeing artificial intelligence initiatives with regard to provider relationships and data, Hochradel's new role at Alignment will involve performing activities about which Hochradel has Elevance Health Confidential Information.

<u>**Chief Execution Officer**</u>

45.    Further, in Hochradel's role as Chief Execution Officer, Hochradel was responsible for leading Elevance Health's transformation team, a group focused on implementing artificial intelligence and technological advances.

46.    As the leader of the transformation team, Hochradel was involved in preparing updates regarding Elevance Health's use and future use of artificial intelligence during Elevance

Health's quarterly business reviews. These updates identify key strategic focus areas and action items to drive growth for Elevance Health.

47.     Specifically, Hochradel was instrumental in developing Elevance Health's "essential future capabilities," which detailed Elevance Health's multi-step plan to use technological advances and artificial intelligence to cut costs, stimulate company growth, and successfully compete against its competitors such as Alignment.

48.     These "essential future capabilities" laid out three years of highly confidential strategic planning initiatives related to Elevance Health's use of artificial intelligence and its intended methods of implementing those initiatives.

49.     Hochradel had a key role in not just designing and executing on this strategy but also updating Elevance Health's Chief Executive Officer on multiple occasions about these initiatives.

50.     Because of the similarities between Hochradel's role as Chief Execution Officer at Elevance Health and his role as Chief Operations Officer at Alignment, Hochradel will inevitably use his knowledge of Elevance Health's Confidential Information in his new role at Alignment.

51.     By seeking and accepting employment with a competitor, Alignment, without prior written consent in a Competitive Position with his roles as Chief Execution Officer and Chief Operations Officer for Health Solutions fewer than twelve months following termination of his employment at Elevance Health, and because Hochradel inevitably will use Elevance Health's Confidential Information in his executive-level position at Alignment, Hochradel has violated the Non-Competition Provisions in the Agreements.

52.     In addition to Hochradel's position at Alignment constituting a Competitive Position under the Agreements, Hochradel's position with Alignment is in a "Restricted Territory"

as defined in the Agreements because in his roles as Elevance Health's Chief Execution Officer, Hochradel had responsibility for, had a material presence in, and had access to Confidential Information about, Elevance Health's business, including Medicare Advantage business nationwide. (*See* Ex. A § 9(c)(ii); Ex. B § 3.6(c)(ii); Ex. C § 7(b)(ii); Ex. D § 7(b)(ii); Ex. E § 7(b)(ii).) Alignment and Elevance Health both currently operate their Medicare Advantage lines of business in Arizona, California, Nevada, and Texas.

53.     Moreover, Hochradel will be performing a "Restricted Activity" as defined in the Agreements because he will be performing an activity for Alignment about which he had Confidential Information from Elevance Health. (*See* Ex. A § 9(c)(iii); Ex. B § 3.6(c)(iii); Ex. C § 7(b)(iii); Ex. D § 7(b)(iii); Ex. E § 7(b)(iii).) Specifically, Hochradel will have responsibility and oversight over Alignment's enterprise operations, transformation initiatives, and its provider operations. Hochradel was provided with extensive confidential and proprietary information concerning Elevance Health's operations, transformation advances, and provider relations through his executive role as Elevance Health's Chief Execution Officer and his previous role as Chief Operations Officer for Health Solutions.

54.     Hochradel failed to notify Elevance Health that he was speaking with Alignment until after he had already accepted the role. Hochradel never notified the Chief Human Resources Officer pursuant to Section 7(b)(vi) of his Performance Stock Award Agreement, Restricted Stock Award Agreement, and Nonqualified Stock Option Award Agreement to confirm that employment with Alignment as the Chief Operations Officer would not violate the Non-Competition Provisions of the Agreements, nor could he have provided any such confirmation because of his clear violation.

## COUNT I- BREACH OF CONTRACT

55.     All previous paragraphs are incorporated by reference herein.

56.     Hochradel and Elevance Health entered into the Agreements, which are valid and enforceable contracts.

57.     The Non-Competition Provisions are reasonably necessary to protect Elevance Health's interest in its Confidential Information and customer goodwill.

58.     The Non-Competition Provisions are reasonable in time, geography, and scope of restricted activities.

59.     Elevance Health's employment of Hochradel and Equity awards constitute consideration for the Agreements.

60.     Elevance Health performed all conditions required of it under the Agreements.

61.     The Agreements prohibited Hochradel from directly or indirectly competing with Elevance Health for twelve (12) months following termination of his employment.

62.     The Agreements also required Hochradel to follow the specified procedure for notifying Elevance Health of a new Competitive Position.

63.     Under the Agreements, in the event of breach, Hochradel is required to forfeit the excess of the fair market value over the exercise price for all stock acquired by Hochradel on exercise of an option within the last twenty-four (24) months, and the fair market value of any common stock that became vested within the last twenty-four (24) months.

64.     Hochradel breached the Agreements by obtaining employment with Alignment, a Competitor, to perform restricted activities in restricted territories without prior written consent in a position directly competitive with his roles at Elevance Health fewer than twelve months after his employment with Elevance Health ended.

65.     As a direct and proximate result of Hochradel's breach, Elevance Health has suffered damages and is entitled to, among other damages, Hochradel's return of the excess of the fair market value over the exercise price for all stock acquired by Hochradel on exercise of an option within the last twenty-four (24) months, and the fair market value of any common stock that became vested within the last twenty-four (24) months.

66.     All conditions precedent to Elevance Health's recovery under the Non-Competition Provisions have been performed or otherwise satisfied.

**WHEREFORE**, Elevance Health respectfully requests that the Court enter judgment awarding Elevance Health compensatory damages against Defendant in an amount to be determined at trial and directing Defendant to pay to Elevance Health his Stock Excess Value, and award Elevance Health attorneys' fees, costs, and expenses and granting such other relief deemed appropriate by the Court.

FBT GIBBONS LLP

By: */s/ Patricia Román Hass*

Kandi Kilkelly Hidde, #18033-49
Patricia Román Hass, #29461-45
Cameron S. Trachtman, #36387-49
FBT Gibbons LLP
111 Monument Circle, Suite 4500
P.O. Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
khidde@fbtgibbons.com
promanhass@fbtgibbons.com
ctrachtman@fbtgibbons.com
*Attorneys for Plaintiff, Elevance Health, Inc.*

0131135.0824987   4913-9048-4402v4